1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BENITO JULIAN LUNA                        No.  2:04-cv-0627 MCE GGH P

12                  Petitioner,

13          v.                                 FINDINGS AND RECOMMENDATIONS

14   SCOTT KERNAN

15                  Respondent.

16

17

18   _Introduction and Summary_

19          Petitioner is a state prisoner represented by counsel, proceeding with an application for a

20   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter was referred to a United States

21   Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

22          Petitioner challenges a judgment of conviction entered against him on December 17, 2001

23   in the Sacramento County Superior Court for first degree murder and attempted robbery.  The

24   court after a bench trial also found true personal and intentional discharge of a firearm.  Petitioner

25   was sentenced to life without the possibility of parole and a consecutive term of 25 years to life.

26          This unfortunately delayed case is now ready for decision.  The reasons for the counsel-

27   induced-delay are set forth in the Ninth Circuit's earlier opinion in this case on a limitations issue,

28

                                                    1

1   Luna v. Kernan, 784 F.3d 640 (9th Cir. 2015); they will not be discussed further here.  But the

2   court again makes clear that present counsel for petitioner had no part in that delay.

3        The First Amended Petition (FAP), filed by previous counsel in this case, raises four

4   issues herein: (1) involuntary confession under the totality of circumstances; (2) improper photo

5   show-up which impermissibly tainted the eyewitness identification; (3) use of perjured testimony,

6   and (4) [listed as "5" in the FAP] cumulative error.  All agree the involuntary confession claim is

7   properly before the court; however respondent contests the exhaustion status of Claims 2 and 3 in

8   that the precise issue presented to the California courts differs from the issue presented in the

9   FAP.  Petitioner's present counsel briefs only Claim 1 in the Traverse.

10        The involuntary confession issue was litigated with an evidentiary hearing in the state

11  courts prior to trial.  In an apparently close case, the trial judge found no actionable misconduct

12  on the part of the police in obtaining the confession, no promise of significance with respect to a

13  family visit, and no substantially serious defects in petitioner's state of mind caused by drug

14  intoxication and related sequellae, which could invalidate the confession.  The Court of Appeal,

15  in a lengthy opinion, agreed.

16        Petitioner's showing on the involuntary confession issue is colorable, but ultimately

17  insufficient under AEDPA to overturn his conviction.  The remaining claims lack merit as well.

18  The petition should be denied.

19  *Background Facts*

20        Given the focus of AEDPA on the underlying state decisions, it is important, albeit

21  lengthy, to set forth the findings of fact by the state appellate court, which are findings of fact for

22  AEDPA purposes.  Sumner v. Mata, 455 U.S. 591 (1982).  The undersigned commences the

23  discussion with the background.

24

25        On the evening of April 30, 2000, Christina Connery and Brandon
          and Aryan Carrafa held a party at their apartment to celebrate a
          friend's birthday. Several guests were present, including the murder
26        victim, Adam Todd.

27        Brandon and a friend went to a nearby store to get some drinks and
          snacks. On their way back, they passed defendant and two other
28        men who were all wearing knit caps (or possibly rolled-up ski

2

masks). Because the apartment had been robbed by three men just a few weeks earlier, Brandon became concerned. Thus, after Brandon and his friend returned to the apartment, they told the others that there might be another robbery.

Aryan retrieved a gun and went with many of the others to the back bedroom. And sure enough, the robbers entered the apartment after kicking in the front door. One robber, who was wearing a ski mask, pushed open the bedroom door, and Aryan shot him. The robber moaned and fell back, and the door shut. Another shot was thereafter heard. Adam Todd's body was later found on the floor in the living room. He had been shot from no more than one foot away, and the bullet had entered his back in a downward angle. It was determined that the bullet could not have been fired from Aryan's gun.

Later that same night, defendant's wife asked a nursing student who lived down the street to come to their home. When she arrived, she saw that defendant had a wound above his right clavicle. She told defendant that she thought it was a bullet wound, but he told her to just fix it. She cleaned and dressed the wound and told him to see a doctor.

At trial, Brandon identified defendant, based on his appearance, as the robber who had been shot. Christina Connery identified defendant as one of the three robbers who came into the apartment, and another guest identified defendant as one of the three men that he and Brandon had passed before the robbery.

Defendant eventually confessed to police. He admitted that he had kicked in the apartment door and that a man in the back bedroom had shot him. He claimed, however, that after being shot, he accidentally discharged the shot that killed the victim. At defendant's request, his wife recovered the gun that he claimed he had used and gave it to police. It was determined that the bullet that killed the victim could have been fired from that gun.

People v. Luna, 2003 WL 21702376 (Cal. App. 2003).

*AEDPA Standards*

The AEDPA standards play an important role in this case, especially those related to state court findings of fact.

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits

3

in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, ___ U.S. ____, ____, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, ___ U.S. ____, ____, 133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ____, ____, 132 S.Ct. 2148, 2155 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not

enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' "). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

Facts adduced in the state courts are given the same type of deference:

> When it comes to state-court factual findings, AEDPA has two separate provisions. First, section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. *Cf. Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."); *see also Torres v. Prunty*, 223 F.3d 1103, 1107–08 (9th Cir.2000) (same standard of unreasonableness applies under subsections (d)(1) and (d)(2)). Second, section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."
>
> We interpret these provisions sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy. The first provision—the "unreasonable determination" clause—applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, *see*, e.g., *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2538–39, 156 L.Ed.2d 471 (2003); *Ward v. Sternes*, 334 F.3d 696, 705–08 (7th Cir.2003), that the process employed by the state court is defective, *see*, e.g., *Nunes v. Mueller*, 350 F.3d 1045, 1055–56 (9th Cir.2003); *Valdez v. Cockrell*, 274 F.3d 941, 961–68 (5th Cir.2001) (Dennis, J., dissenting), or that no finding was made by the state court at all, *see*, e.g., *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir.1999); *cf. Wiggins*, 123 S.Ct. at 2539–41. What the

1

2

3

4

5

6

7

8

9

> "unreasonable determination" clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. *Cf. Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166. Similarly, before we can determine that the state-court fact finding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

10   Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).

11   The undersigned therefore finds that the same deference is paid to the factual

12   determinations of state courts, including those of the state appellate courts.  Sumner v. Mata,

13   supra.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be

14   overturned on factual grounds unless it is "objectively unreasonable in light of the evidence

15   presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

16   384 F.3d 628, 638 (9th Cir. 2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2)

17   in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error

18   must be so apparent that "fairminded jurists" examining the same record could not abide by the

19   state court factual determination.  If a party is ultimately permitted to add evidence to the federal

20   record, a petitioner must show clearly and convincingly that the factual determination is

21   unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

22   The court looks to the last reasoned state court decision as the basis for the state court

23   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

24   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

25   previous state court decision, this court may consider both decisions to ascertain the reasoning of

26   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

27   "[Section] 2254(d) does not require a state court to give reasons before its decision can be

28

6

1   deemed to have been 'adjudicated on the merits.'" Harrington, 562 U.S. at 100. Rather, "[w]hen

2   a federal claim has been presented to a state court and the state court has denied relief, it may be

3   presumed that the state court adjudicated the claim on the merits in the absence of any indication

4   or state-law procedural principles to the contrary." Id. at 784-85.  This presumption may be

5   overcome by a showing "there is reason to think some other explanation for the state court's

6   decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

7   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

8   but does not expressly address a federal claim, a federal habeas court must presume, subject to

9   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S.

10  ____, ____, 133 S.Ct. 1088, 1091 (2013).

11          When it is clear, however, that a state court has not reached the merits of a petitioner's

12  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

13  habeas court must review the claim de novo. Stanley, 633 F.3d at 860.  The state courts need not

14  have cited to federal authority, or even have indicated awareness of federal authority in arriving at

15  their decision. Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365 (2002).  Where the state court

16  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

17  habeas court independently reviews the record to determine whether habeas corpus relief is

18  available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th

19  Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue,

20  but rather, the only method by which we can determine whether a silent state court decision is

21  objectively unreasonable." Himes, 336 F.3d at 853.  Where no reasoned decision is available, the

22  habeas petitioner still has the burden of "showing there was no reasonable basis for the state court

23  to deny relief." Harrington, 562 U.S. at 98.  A summary denial is presumed to be a denial on the

24  merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While

25  the federal court cannot analyze just what the state court did when it issued a summary denial, the

26  federal court must review the state court record to determine whether there was any "reasonable

27  basis for the state court to deny relief." Harrington, 562 U.S. at 98. This court "must determine

28  what arguments or theories...could have supported, the state court's decision; and then it must ask

7

1   whether it is possible fairminded jurists could disagree that those arguments or theories are

2   inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 786.  "Evaluating

3   whether a rule application was unreasonable requires considering the rule's specificity.  The more

4   general the rule, the more leeway courts have in reaching outcomes in case-by-case

5   determinations."  Id.  Emphasizing the stringency of this standard, which "stops short of imposing

6   a complete bar of federal court relitigation of claims already rejected in state court

7   proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean

8   the state court's contrary conclusion was unreasonable."  Id.  The petitioner bears "the burden to

9   demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

10   Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Harrington, 562 U.S. at 98).

11   *Discussion*

12          A. Involuntary Confession

13                 1. *Background*

14          Petitioner's primary issue in this habeas involves his claim of involuntary confession.  The

15   claim itself is directed at three sub-issues: promises of leniency made by the interrogators,

16   promises that petitioner would get to see his family if he told the "truth," and petitioner's mental

17   state, i.e. his drug intoxicated state of mind (methamphetamine) and the sequellae from use of

18   methamphetamine.

19          Importantly, petitioner does *not* attack the *process* used to find the facts—an evidentiary

20   hearing in state court followed by an appellate decision. The standard, as petitioner recognizes,

21   and as discussed above, is whether *any* "fairminded" appellate court could reasonably arrive at

22   the decision it did based on the record.  This standard is much stricter than a mere review by this

23   court as to whether the state courts had substantial evidence for their decisions, or whether this

24   court in retrospect believes a "wrong" decision was made.

25          Because the fact finding of the state courts, and including that of the Court of Appeal, is

26   the focus in this AEDPA case, the undersigned quotes at length from that very detailed opinion.

27                 1. May 2 interview

28                 On May 2, 2000, police took defendant to the police station for

8

questioning. Detectives David Wright and Elaine Stevenson advised him of his *Miranda* [footnote omitted] rights, and he acknowledged that he understood them.

During the interview, defendant said that he had recently used methamphetamine. One of the detectives checked defendant's arm and noticed injection marks that were apparently made in the last 24 hours.

Defendant also claimed that he had been at home on or about the time of the incident. When asked how he injured his shoulder, defendant claimed that he had slipped and fallen on a board with a nail in it.

Detective Wright explained that the police were investigating a home invasion in which someone was killed and one of the perpetrators was shot, and that the detectives did not believe the injured perpetrator was the killer. Defendant continued to insist that he was at home on the night of the incident. When police took defendant home following their questioning, they looked for a board with a nail but were unable to find one.

Witnesses subsequently identified defendant based on a photo lineup, and police obtained a warrant for his arrest.

2. Morning and early afternoon interview on May 4

On May 4, 2000, defendant was arrested at a motel in Roseville, where he was registered under another name. In his motel room, police found some marijuana but no methamphetamine or related paraphernalia.

Defendant was taken to the police station and again interviewed by Detectives Wright and Stevenson. One of defendant's hands was handcuffed to a table for most of the time that he was in the interview room. At one point, defendant said that he had recently injected methamphetamine and was under the influence of it. Later, defendant complained that he had "cotton mouth" and had been running a temperature. But defendant was generally alert, coherent, and responsive, as will become apparent from the following summary of his conversation with detectives. However, Detective Wright did notice that defendant's wound appeared to be in the beginning stage of infection. During the conversation with defendant, the detectives indicated that he would receive medical treatment after he was booked.

When the detectives initially entered the room, defendant asked if he was "still" being charged with murder and said that he was not involved. He claimed that he had been shot in an apparent retaliatory incident because he had testified against a gang. Detective Wright reminded defendant of his *Miranda* rights, and he acknowledged he understood them. Defendant indicated that he would like to talk to the detectives, but commented, "This other dude ... was ... saying ... I better come in here and talk to you right, and calling me names, and shit like that." Detective Wright

emphasized that they only wanted defendant to talk as long as he wished to do so and not because someone had threatened him. Defendant wanted to call his wife to tell her where he was, but Wright said that she already knew. Defendant then began to discuss the circumstances of the alleged incident in which he was shot.

The detectives were skeptical of defendant's claims of innocence. They indicated that they knew that he was involved in the incident that they were investigating and described some of the evidence against him, including the fact that witnesses had identified him. Detective Wright told defendant that he would be arrested and booked for residential robbery and murder. But Wright said that they wanted to give defendant the opportunity to explain what had happened, although it was up to him whether to tell them. Defendant continued to maintain his innocence.

Wright said that the district attorney had the option of charging defendant as if he had been the shooter, and suggested that after defendant was booked into the jail and had an attorney, he should have his attorney contact the district attorney to see if they could negotiate some type of deal.

Shortly before he left the interview room, defendant asked how the detectives knew that he was involved and whether there might be any deals available. Detective Stevenson told defendant that it was up to his lawyer and the district attorney to discuss deals and that she did not know what could be arranged. But Stevenson cited some examples in which a possible life sentence had been reduced to a term of 10 or 15 years or the death penalty had been avoided. Still, she concluded by reiterating that she did not know what could be arranged by defendant's attorney and the district attorney and that it was "completely up to them."

Defendant expressed concern for his wife and stepson, and Detective Stevenson agreed to tell them that defendant loved them. [footnote omitted] Defendant also indicated that he wanted to see them. Detective Stevenson told defendant that his wife was "already" planning to come the next day. When defendant asked about being able to "give her a kiss bye," Stevenson said that he would probably not be able to do so.

In preparation for his transportation to the main jail, defendant was escorted from the interview room by Sergeant Craig Hill, the homicide supervisor, and Deputy Sheriff Marcie Minter.

B. Sergeant Hill's Conversation with Defendant

The subsequent conversation between defendant and Sergeant Hill is a matter of dispute and the basis for defendant's claim that his confession was involuntary.

Sergeant Hill had participated in defendant's arrest and had been briefed on the questioning.

10

Deputy Minter rode in the elevator with Sergeant Hill and defendant before the two left for the jail. According to Minter, Hill spoke in a calm and friendly voice but told defendant that he should have told the truth, he had "kind of fucked [him]self," and "things like that." Minter acknowledged that she had told an investigator from the district attorney's office that what occurred had made her uncomfortable. But although Minter initially said that she did not remember why it made her uncomfortable, she later referred to the fact that it was not being recorded.

However, according to Detective Stevenson, about a year after defendant had been arrested, Minter told her that Hill had told defendant that "he was screwed, that he was going to go to prison for a long time for this offense, and that he could call the D.A.'s Office and work a deal and maybe get him less time."

Sergeant Hill did not remember the conversation in the elevator. But he testified that he never agreed to go to the district attorney's office to negotiate some type of lenient arrangement for defendant. Hill further explained that he spoke with defendant during the short ride to the jail and that they continued to talk for an additional "45 minutes or so" in the garage at the jail. Hill was never hostile to defendant. Defendant was initially very calm but became more emotional as they spoke. He remained alert and coherent and never said that he did not want to talk to Hill. Defendant was not "fidgeting," nor did he appear "wired at all."

Sergeant Hill allowed defendant to smoke while they were in the garage. And Hill even shifted defendant's handcuffs from the back to the front at some point.

During their conversation, Hill told defendant that he "should have done the right thing" and told the truth, indicating that it would be better because his stepson would find out eventually. Hill said that it was better that defendant tell police so that they would not have to question his family. But Hill never threatened defendant or his family. When specifically asked about whether he had threatened to arrest defendant's wife, Hill said that he had not threatened to arrest her if defendant simply refused to talk, but had indicated that she could be arrested if police determined that she had withheld information.

Defendant asked questions about how the robbers had been identified if they wore masks. At some point, defendant said that he could not "tell on them," apparently referring to his confederates, and at that point Hill felt that defendant wanted to tell his side of the story. But although defendant wanted to see his wife before giving a statement, Hill said that he could visit with his family only after speaking with Detectives Stevenson and Wright again. Defendant asked about a possible deal, but Hill told defendant that he was not in a position to make any type of deal. Defendant eventually admitted his involvement in the crimes under investigation, and Hill took defendant back to speak with Wright and Stevenson.

11

At the suppression hearing, defendant contradicted Sergeant Hill's account of their conversation. Defendant claimed that his stomach had been upset when he spoke with Hill, that he was initially "really high on drugs," and that Hill intimidated him. Defendant also said that in addition to the handcuffs, he was wearing leg irons. Defendant said that he was crying at some points when Hill spoke with him and also shaking because of the drugs.

On the other hand, defendant acknowledged that he was facing a life sentence as a third-strike offender, that he was "no rookie in the criminal justice system," and that he had spoken with a lot of police officers in the past. He agreed with the prosecutor that "you talk to them if you want to" and "if you don't want to, you don't talk to them."

Defendant said that Sergeant Hill had told him that he had "fucked up" and should have told the truth, but that he (Hill) could talk to the district attorney (whom he knew personally) about a reduced sentence. Sergeant Hill also talked about "doing the right thing for [his] [step]son, showing him that being truthful and honest is the right thing to do." Hill told defendant that if he did not come forward, the police would arrest his wife and put his stepson in a foster home. On the other hand, Hill promised an hour-long visit with his family if he confessed. Defendant testified that he was scared and was also concerned about his wife because she had had a recent tubal pregnancy. Hill let him smoke while they talked even before he decided to confess.

When asked to summarize the deal that he reached with Sergeant Hill, defendant testified: "That ... I was gonna be able to smoke while I'm giving the confession. I was going to be allowed to visit my wife and [step]son, medical attention, and that he would go to the D.A.'s Office for leniency for confessing but I had to do all-I had to confess before the promises [were] given to me." Defendant acknowledged that Hill did not promise any particular sentence, but defendant thought that it would be in the 10- to 15-year range. Hill told defendant that the deal was between the two of them and indicated that defendant should not tell the others about it. When directly asked why he did not later tell Detectives Wright and Stevenson about it, defendant responded: "I felt that since they were saying that I can't make deals, um, if I would have said something to them, that what me and Craig Hill talked about, that all the deals would have been off pretty much."

With respect to his injury, defendant indicated that someone looked at it when he was later booked in the jail. A couple of weeks later, a doctor actually treated the injury.

C. Videotaped Confession

Defendant was brought back to the interview room to speak with Detectives Wright and Stevenson.

Defendant subsequently said: "So how can we help each other?" Detective Wright responded by reminding defendant of his

12

*Miranda* rights, and defendant asked whether he would have to testify "against them." Detective Wright assured him that he did not have to testify unless he wanted to do so. But Detective Wright also told defendant that anything he told police would be in the record and available to the attorneys of anyone arrested in the case.

Detective Stevenson asked if that answered defendant's question, and defendant responded, "Um-yeah, but like I was telling him-um-can't-there be another way-that I could set 'em up of, you know what I'm saying, like where we jump a fence at, fingerprints and shit like that. You know what I'm saying?"

Detective Wright explained that they were concerned about the homicide in this case and that it was not like a drug case where a controlled buy could be arranged. Defendant said, "So it's putting my wife and [step]son in danger more jeopardy then." Detective Wright told defendant that it was "putting everybody in a lot of jeopardy," but that the police were going to do what it took to solve the murder and he could not make defendant any promises.

Detective Wright emphasized: "Only the district attorney's office can make promises. We can't, and I want you to know ahead of time before you say anything else we do not have the authority to make any promises, or threats, or anything to you.... It's totally up to the D.A.'s office. We are just basically the people who get the facts and give it to the D.A.'s office, and I'm not gonna mislead you and make you think that we can work deals out with you or anything like that...." Defendant responded: "I didn't-all-I'll say it. I just want to be able to explain to my wife. You know what I'm sayin'? I need to talk to her, and then I can give you these guys." Wright answered, "Well, we-we can arrange for you to meet with your wife, but in order for you to talk to us we just need you to be able-we need you to be willing to talk to us-um-on your own-your own-basically, your own decision. Your wife and your [step]son are not here right now. They've already been taken home."

Defendant subsequently said: "Um-like I was talking to the other guy, you know, I'll tell you the truth, you know what I'm sayin', now. [¶] ... [¶] I know you can't make promises. Just let me see my wife. You know what I'm sayin'? Um-I don't know the streets['] names and stuff. I just know how to get there to where they all are."

Defendant then proceeded to tell the detectives about other men involved in the robbery and to describe what had occurred. But defendant continued to express concern about his confederates learning that he had told on them.

Defendant later acknowledged that he was "through" and did not want to protect anyone other than his wife and stepson. Defendant asked about "the other guy," apparently referring to Sergeant Hill. Detective Wright indicated that Hill may have been going to pick up defendant's wife and stepson. Detective Wright also told

defendant that he could not make any promises but would see if they could be brought into the interview room.

13

When Detective Stevenson later asked defendant why he was "finally telling" them what had happened, he said: "Just not being with my wife and my [step]son, fucking I wish I could die. You know? Thought about that when the [SWAT team] came."

When Detective Stevenson again asked defendant why he had told police what had happened and what had changed since earlier that afternoon, defendant answered: "All kinds. You know what I'm saying? I never wanted to rat my friends out. You know what I'm saying? Especially Albert. We're like brothers." Detective Stevenson said, "But?" and defendant continued, "My wife, and my [step]son, my father. There's times that after this happened you guys came around talking. Just wanted to go out and blast myself.... I'll never get to hold my wife again or my [step]son."

Defendant later referred to someone else who was involved in the offenses and again asked about a deal. The detectives reiterated that it was normally the responsibility of the defense attorney and prosecutor to negotiate deals in these types of cases. Defendant remarked that he could get "twenty-five to life" and did not "see them dropping it." The detectives allowed defendant to smoke during part of his discussion with them.

When defendant's wife and stepson were available, Detective Stevenson told defendant that he would not have the whole night to talk to them. Defendant said, "Yeah. He said he was gonna try to give me an hour and stuff." Although defendant was left alone with them, the videotape continued to record their conversation. Defendant's wife asked at one point why he did "this," apparently referring to his confession. Defendant said, "Cuz they wanted me to roll over on everybody. I did it so I could see you guys." Referring to Hill, defendant said, "[He] kept talkin' about shit. Said, come on. Come on, man. Know what I'm sayin'? You know that's your kid." Defendant told his wife that he was facing a potential life sentence, although he later suggested that "maybe" the D.A. would work for him.

Sergeant Hill subsequently returned and spoke with defendant. Defendant promised to have his wife arrange to get the gun that he had used in the crime. Hill responded, "Okay. Everything else is pretty squared away, though, as far as your honest answers?" Defendant agreed but subsequently asked, "What else can I give to beat this?" Hill indicated that defendant should not be so concerned about escaping responsibility for his actions and that he should face the consequences. Defendant agreed, but he complained about "doin' time" and mused "[t]hat means I can never have babies."

People v. Luna, 2003 WL 21702376 at *2-7.

## 2.   _Standards for Judging the Voluntariness of a Confession_

The Court of Appeal engaged in a lengthy analysis of the facts in affirming the trial court's conclusion that the confession was voluntary.  However, the undersigned pauses in setting

forth that analysis to review the federal standards as enunciated by the Supreme Court concerning voluntary confession; Ninth Circuit cases which summarize that authority are very useful.

First, the ultimate conclusion that a confession is voluntary is a conclusion of law, not fact. Miller v. Fenton, 474 U.S. 104, 110 (1985).  However, subsidiary issues of fact necessary for the ultimate conclusion are questions of fact, and are entitled to an appropriate presumption of correctness. Id. at 111-112.

Next:

In implementing this bedrock constitutional value, our focus is on "whether [the] defendant's will was overborne by the circumstances surrounding the giving of [the] confession," an inquiry that "takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)) (internal quotation marks omitted) (emphasis added).

"Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant." *Culombe*, 367 U.S. at 602, 81 S.Ct. 1860; *see also Withrow v. Williams*, 507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Thus, the voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive,' " *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944)), but "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will," *id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). Ultimately, the voluntariness "determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' " *Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326 (quoting *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), overruled in part on other grounds by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)) (alteration in original).

***

Also consistent with the directive that we must consider "all the surrounding circumstances," *Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326, in determining the voluntariness of a confession is that there is "no talismanic definition of 'voluntariness,' mechanically

15

applicable to the host of situations where the question has arisen," *Schneckloth*, 412 U.S. at 224, 93 S.Ct. 2041. Because there is no "single controlling criterion," no single factor, such as length of interrogation, can be dispositive. *Id*. at 226, 93 S.Ct. 2041.

*Doody v. Ryan*, 649 F.3d 986 (9th Cir.2011), an en banc opinion of this court, provides guidance for carrying out the multivariate inquiry essential to the voluntariness inquiry: We may not "tick[ ] off the list of circumstances rather than actually considering them in their totality." *Id*. at 1011. So it is not enough for courts to "list[ ] the circumstances of [an] interrogation separately on a piece-meal basis." *Id*. (internal quotation marks omitted). Courts must "weigh, rather than simply list," the relevant circumstances, and weigh them not in the abstract but "against the power of resistance of the person confessing." *Id*. at 1015–16 (internal quotation marks omitted).

\*\*\*

Because of these considerations, the question whether a confession was voluntary is "to be answered with complete disregard of whether or not [the confessor] in fact spoke the truth." *Rogers*, 365 U.S. at 544, 81 S.Ct. 735. A "coerced confession is inadmissible under the Due Process Clause even though statements in it may be independently established as true." *Watts*, 338 U.S. at 50 n. 2, 69 S.Ct. 1347. Thus, although "coerced confessions are forbidden in part because of their 'probable unreliability,' " *Lego v. Twomey*, 404 U.S. 477, 484 n. 12, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the voluntariness inquiry focuses not on the truth or falsity of the confession, but on the coercive nature of the interrogation—again, taking into account the particular circumstances of the suspect. [footnote omitted]

United States v. Preston, 751 F3d 1008, 1016-1018 (9th Cir. 2014) (en banc).

False promises or threats may render a confession invalid. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements that state financial aid for defendant's infant children would be cut off, and her children taken from her, if she did not cooperate); Rogers v. Richmond, 365 U.S. 534, 541–45, 81 S.Ct. 735 (1961) (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody); Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. (1966) ("any evidence that the accused was threatened, tricked, or cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the defendant did not voluntarily waive his privilege").  But *cf*. Pollard v. Galaza, 290 F.3d 1030, 1034 (9th Cir.2002) ("misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct").

16

The Supreme Court has stated that promises "however slight" may render a confession involuntary, <u>Bram v. United States</u>, 168 U.S. 532, 542-543 (1897),[1] but even petitioner understands that the "promise" must be weighed in the totality of circumstances, citing <u>Fikes v. Alabama</u>, 352 U.S. 191, 197-198 (1957), and <u>United States v. Preston</u>, <u>supra</u>.

The undersigned has paid special attention to the AEDPA Ninth Circuit case of <u>Brown v. Horell</u>, 644 F.3d 969 (9th Cir.2011).  This case analyzed a situation, akin to the one in part, presented by this case, where an interrogated defendant was promised that he would get to see the birth of his child if he told the truth.  <u>Brown</u> analyzed the spectrum of case law, especially the case of <u>Lynumn v. Illinois</u>, 372 U.S. 528, (1963) [cited supra], in which the Supreme Court found an involuntary confession in the circumstances where an interrogated defendant was told that state financial aid for her children would be cut off and her children taken from her if she did not "cooperate."  <u>See also</u> <u>Rogers v. Richmond</u>, 365 U.S. 534, 541–45, 81 (1961) [cited supra] (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody).  However, after a canvas of authority, the <u>Brown</u> court held that although threats and promises regarding one's children carry special force, <u>Id.</u> at 980 (and presumably cases involving one's spouse), "[t]hese cases reveal that lower federal courts do not always interpret Lynumn to mean that threats or promises relating to one's children or family warrant special caution, as we have in <u>Tingle</u>,[2] but only that such threats or promises may be considered as part of the totality of the circumstances."  <u>Brown</u>, 644 F.3d at 982.  The Brown court went on to find that although it might have decided the issue differently on a direct review,

---

[1]  See also, <u>Brady v. United States</u>, 397 U.S. 742, 754 (1970) (holding that when the accused is "in custody, alone and unrepresented by counsel ... even a mild promise of leniency [has been] deemed sufficient to bar the confession ... because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess."); <u>Williamson v. United States</u>, 512 U.S. 594, 620 (1994) ("[I]n cases where the statement was made under circumstances where it is likely that the declarant had a significant motivation to obtain favorable treatment, as when the government made an explicit offer of leniency in exchange for declarant's admission of guilt, the entire statement should be inadmissible.") (Kennedy, J., concurring).

[2]  <u>Tingle v. United States</u>, 658 F.2d 1332, 1335-36 (9th Cir. 1981).  A threat that defendant would never see her children again if she did not tell the truth and was facing a long term of imprisonment was found to be unduly coercive.

17

1    AEDPA directed a different result, i.e., fairminded jurists could disagree that the state court's

2    decision conflicted with Supreme Court precedents.[3]

3         Nor do promises of leniency by the interrogator always result in an overturned conviction.

4    Rather, the "promise must be sufficiently compelling to overbear the suspect's will in light of all

5    attendant circumstances."  United States v. Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).  Thus,

6    in Guerrero, the Ninth Circuit held that an officer's promise both to inform the prosecutor about a

7    suspect's cooperation and to recommend leniency was insufficient to render the suspect's

8    resulting confession involuntary.  847 F.3d at 1363; see also United States v. Harrison, 34 F.3d

9    886, 891 (9th Cir. 1994) ("[I]n most circumstances, speculation that cooperation will benefit the

10   defendant or even promises to recommend leniency are not sufficiently compelling to overbear a

11   defendant's will.") (citation omitted).

12        Finally, the state of mind of the person undergoing interrogation, i.e., his physical and/or

13   mental state, can be a factor of the totality of circumstances which might in combination with

14   other factors render a confession involuntary.  The mere fact that a criminal defendant was under

15   the influence of drugs or medication during the interrogation is insufficient to establish a claim of

16   involuntariness.  See Clabourne v. Lewis, 64 F.3d 1373, 1379 (9th Cir.1995); see also Colorado v.

17   Connelly, 479 U.S. 157, 164–65 (1986) (holding that, while relevant, a mental state that renders

18   the defendant susceptible to police coercion is not dispositive evidence that the defendant's

19   statements to the police were involuntary).

20        Simply being under the influence of alcohol and drugs at the time of police interrogation

21   is insufficient to render a confession involuntary.  United States v. George, 987 F.2d 1428 (9th

22   Cir.1993) (defendant in hospital and suffering from possible drug overdose at time of

23   interrogation); United States v. Kelly, 953 F.2d 562 (defendant suffering from heroin withdrawal

24   at time of interrogation and finding that police did not engage in any coercive "take advantage"

25   [3]  Petitioner asserts that Brown found the confession in its case to be involuntary, but such is not
26   accurate insofar as a case involves the AEDPA.  Although the Brown court stated that it might
     find the confession involuntary if ruling on direct review, AEDPA overcame that inclination, and
27   it could not be found that the state court was 'unreasonable" in its contrary determination.  "We
     therefore affirm the district court's denial of Brown's habeas corpus petition on the ground of the
28   admission of involuntary statements."  Brown, 644 F. 3d at 982.

1   conduct); United States v. Martin, 781 F.2d 671 (9th Cir.1985) (defendant in hospital, in pain and

2   under influence of pain killer).  Examples of cases in which the defendant is so ill that

3   interrogation was improper are:

4          In Townsend v. Sain, 372 U.S. 293 (1963), a 19–year old heroin addict was arrested while

5   under the influence of heroin.  He was moved from police station to police station and run

6   through a line-up over a period of approximately nine hours.  During the interrogation process he

7   went into drug withdrawal, was unresponsive to questioning, was injected by a doctor with

8   phenobarbital and hyoscine and given extra phenobarbital tablets to take later to alleviate the

9   withdrawal symptoms.  Questioning continued and he gave a full confession.

10          In Mincey, supra, the defendant was in an intensive care unit with a hip wound, damaged

11   sciatic nerve and partial paralysis of his right leg.  He had tubes in his throat and nose, a catheter

12   in his bladder, he was hooked up to an I-V unit, and had received various drugs.  He could not

13   talk and had to write answers to the officer's questions.  He was given a Miranda warning by the

14   interrogating officer.  In spite of the fact that the defendant asked repeatedly that interrogation

15   stop until he could get a lawyer, the officer questioned him continuously for four hours.

16   It is a factual determination as to how intoxicated, tired and/or hungry one is while being

17   interrogated such that it becomes an important factor in the totality of circumstances, or a very

18   weak one, if affecting the whole inquiry at all.  Similarly, the content of a promise, or whether a

19   promise was made at all, is factual in nature.  The undersigned now turns to the all important

20   factual determinations of the state courts.

21          3. *Analysis*

22          Petitioner does not take issue with the final, "legal" application of facts by the state courts

23   to clearly established law.  That is *if* the factual findings of the state court were not assailable,

24   there is no reason to believe that petitioner would find the legal conclusions of the state courts

25   regarding involuntariness to be in error.  Rather, petitioner argues that the factual findings,

26   including credibility findings, were incorrect *on the record*, and then argues that if the true facts

27   were analyzed, federal error would be established.  Petitioner makes his argument solely from a

28   ////

1   record standpoint, and does *not* seek an evidentiary hearing based on extra-record facts.[4]

2        There were three areas in which petitioner found the factual conclusions to be

3   unreasonable: promises of leniency, promises that petitioner would be able to see his family, and

4   finally petitioner's physical/mental state as it affected his ability to "volunteer" a confession.  Lest

5   there be any confusion, while clearly recognizing that the ultimate conclusion is made by

6   weighing the *totality* of the circumstances, the undersigned must initially assess the

7   reasonableness of the state courts' factual findings in the three areas individually in order to find

8   out what those particular circumstances were, or were not.  Only then can the ultimate assessment

9   of voluntariness be made based on an analysis of the totality of the found circumstances.

10        a.   *Promises of Leniency*

11        This factual area is perhaps the most contested of the three.  However, petitioner does not

12   argue that *given the facts found by the Superior Court and the Court of Appeal,* the legal

13   conclusion of a voluntary confession was AEDPA error.  Rather, petitioner focuses upon a

14   dispute in the facts--the exchange between a Sgt. Hill (supervisor of the interrogating detectives)

15   which took place in the elevator and the garage on petitioner's aborted trip back to the jail.  The

16   *factual* finding that Hill did not make an actionable promise of leniency is the finding under

17   attack.  Petitioner does not contend that the actual interrogating detectives were anything but

18   scrupulous in their statements to petitioner that they could offer no deals.

19        The facts concerning the Hill exchange, both prosecution and defense position, were set

20   forth at length above and will not be repeated in their entirety here.  But to again set the scene,--

21   not much progress had been made during the first session on the second day of interrogation held

---

22   [4]  Petitioner is correct in his method of attack.  One does not get an evidentiary hearing just for

23   the asking.  Cullen v. Pinholster, 563 U.S. 170 (2011).  Rather, one must show that either the application of law or the findings of fact *on the record* were AEDPA unreasonable before one

24   might be given an evidentiary hearing to display all the relevant facts.  See Hibbler v. Benedetti, 693 F.3d 1140, 1147-48 (9th Cir. 2012); Hernandez v. Ducart, 2016 WL 2851309 (C.D. Cal.

25   2016).  Although there is some potential problem when comparing the habeas statute provisions 28 U.S.C. section 2254(d)(2) and (e) (1), the latter invites a petitioner to disprove factual findings

26   by clear and convincing evidence, see Wood v. Allen, 558 U.S. 290 (2010) (recognizing the potential conflict, but ultimately avoiding the issue), no such potential exists here in that an

27   evidentiary hearing was held in state court and petitioner does not seek to add additional

28   evidence.

1   some days later after the very first interrogation.  The interrogation over, petitioner was going to

2   be escorted to jail, and Sgt. Hill volunteered to do that escorting.  In the elevator on the way down

3   to the transporting vehicle, Hill.  Petitioner, and another detective (Minter), unrelated to the

4   interrogation, rode the elevator down.  At this time an exchange took place at which time

5   petitioner was told, at the very least, that he had "f'ed" himself, or screwed himself, by not telling

6   the truth.

7       Petitioner related at the suppression hearing that, while in the elevator, Hill had offered to

8   go to the DA, who he knew personally, and work a deal if he told the truth, RT 140, and

9   according to petitioner, this subject was continued when he and Hill were in the garage discussing

10  the case.

11      Minter, about one year after the elevator incident, at some type of training event, and for

12  unknown reasons, happened to casually mention to one of the interrogating attorneys, Stevenson,

13  that indeed Hill had stated to petitioner that he had "screwed" himself (presumably by not telling

14  the truth), that he was going to go to prison for a long time; Stevenson was told by Minter that

15  while in the elevator, Hill had told petitioner a deal could be worked out with the DA.  RT 122,

16  123.  Stevenson did not remember that Minter spoke of being uncomfortable, RT 125.

17  At the suppression hearing, Minter testified that a conversation between Hill and petitioner did

18  take place, but it was limited to the assertion that petitioner had "f'ed" himself by not telling the

19  truth.  RT 109.  She did not recall whether any deal making conversation took place, id; Hill's

20  demeanor at the time was casual and friendly.  Id.  Minter remembered feeling uncomfortable, but

21  could not initially remember why, RT 111, but on re-direct supposed that her feeling of being

22  uncomfortable resulted from the fact that this conversation by petitioner and Hill was not being

23  videotaped, RT 116-117.

24      Sgt. Hill arrived at the Sacramento County Jail with petitioner.  However, the two did not

25  go up to booking right away.  Sgt. Hill and petitioner remained in the garage of the jail for about

26  45 minutes where Hill and petitioner spoke.  The deal making, amongst other subjects, allegedly

27  continued in the garage where petitioner was allowed to smoke and Hill told petitioner that he

28  knew the DA personally and could work a deal, maybe 10-15 years if the truth was told.  After

being in the garage for some time, petitioner agreed to go back up to the interrogation room for continued questioning.  Sgt. Hill brought him back to the homicide department offices and the interrogation by Wright and Stevenson re-commenced.  It was at this time that petitioner implicated himself in the crime.

The most important testimony was that of Detective Minter and Stevenson who partially corroborated petitioner's position—but how much was in dispute.

The appellate court first synthesized the trial court's findings:

> After oral argument, the trial court gave a lengthy explanation of its decision. The court commented that it did not think that there was an issue concerning defendant's wound, his drug intoxication, or "the visitation"-although the visitation was "closer." The court concluded that the case turned on the credibility of defendant and Hill, and said that it believed that Hill was truthful about being unable to recall what had happened in the elevator. The court questioned defendant's credibility based on his criminal record but further commented that "both sides" were "trying to protect themselves."

> The court found no direct indication in the transcript of a purported deal between defendant and Hill and emphasized that it was difficult to believe defendant's explanation that Hill had told him to keep any such arrangement between themselves. In conflict with any arrangement, the court noted that defendant had stated that he had understood his life was over. The court also observed that defendant knew that he could be charged as the shooter and that the detectives had warned him that they could not make any promises.

> Further, the court emphasized that defendant told his wife that he had confessed so that he could see his family. The court stated, "That's the motivating factor. Because he testified [that] his prime concern was with his wife, wanting to see her, especially after the tubal pregnancy and miscarriage."

> Referring to Deputy Minter's purported conversation with Detective Stevenson that recounted that Hill had told defendant that Hill could call the district attorney's office to work out a deal, the court commented that Minter's credibility "suffers so that we don't know what to believe." The court explained: "Maybe she told Elaine Stevenson what Stevenson says. Maybe she didn't. She said she didn't. And then even if she did tell Stevenson that, maybe it was true or maybe it wasn't. [¶] Doesn't sound like she meant it to be any sort of a[n] official report or wanted any action done. It sounded-for all I can tell it was just gossip. You know sort of just like between you and me. Probably maybe realize[d] that Stevenson wouldn't do anything about it. [¶] At any rate, I think the bottom line is that, um, I just don't believe that Hill said I will go over to the D.A.'s Office and get you less time." The court found by a

22

preponderance of the evidence that "that promise of leniency was not in fact made."

The court concluded: "It's just hard for this Court to believe that you've got the subordinates like Wright and Stevenson who are so conscientious that they're working for a supervisor that is just absolutely out of control as far as caring about people's [c]onstitutional [r]ights. [¶] Just doesn't-I-I-I watched them all testify, um, and again I think the bottom line-the main issue is the credibility of Hill versus [defendant]. And I think the nod has to go to Craig Hill. So I will accept his representation that he never said it." [n. 3].

[n. 3: While discussing the matter with the parties before actually rendering its decision, the court acknowledged the possibility that Hill was "selectively remembering what happened." But the court said it was hard for it to "swallow" that arguably one of the most experienced and knowledgeable homicide detectives committed such a blatant violation of someone's constitutional rights in the presence of a subordinate.]

Finally, as to defendant's physical and mental condition, the court noted that defendant was responsive, although he appeared to be somewhat sleepy. The court further found that defendant was lucid, his speech was not slurred, and there was no pressure or intimidation from the detectives.

People v. Luna, 2003 WL 21702376, at *7-8.

The appellate court found several reasons why the trial court's conclusion was supported by substantial evidence. This court's job, however, is not to assess "substantial evidence," but to ascertain whether the trial court and appellate court were AEDPA unreasonable in the findings of fact.

Most important to the undersigned, and an important factor with the appellate court, was the fact that the trial court had made a credibility determination. As demonstrated by the facts above, this determination was critical. If the court had found Sgt. Hill to be untruthful, the legal conclusion of voluntary confession may well have gone the other way since the "Sgt. Hill said he would go the the DA for a deal" version may constitute a sufficient promise to overbear one's resistance to confession after days of interrogation, a somewhat weakened physical state, and the realization that petitioner might not ever live with his family again, if given a life sentence. But see Guerrero, Harrison, supra. Petitioner might have jumped at a ten year deal. However, the trial court found against that version, and such a credibility determination is perhaps the most

23

1  difficult to overturn in federal habeas since only the trial judge heard and saw the testimony.

2  Only if the undersigned found, after reviewing the transcript, that the evidence was so far against

3  the credibility determination that no reasonable jurist could make such a finding, would the

4  determination be discarded.

5           For the reasons set forth by the appellate court, there was plenty of evidence which

6  corroborated the trial court's adverse-to-petitioner's-version credibility finding.  The "don't tell

7  anyone about the deal" is suspect because petitioner would have no reason to believe that Hill

8  was unconstitutionally promising him a deal.  When Stevenson and Wright again reiterated that

9  they could make *no* promises whatsoever about a deal, any reasonable person would not confess

10 until the discrepancy could be worked out.  To find that it only took a short elevator ride for

11 petitioner to completely disregard the interrogating detectives' insistence that they could make no

12 deals, and put all his faith in a police officer he had only met briefly, is unreasonable.

13 As the appellate court stressed, just before he confessed, petitioner acknowledged to Wright and

14 Stevenson that no promises could be made.  Petitioner asked, *after* he confessed: could he make a

15 deal with him [the DA].  Why would he ask such a thing if the deal was "in the bag" already.

16 Moreover, petitioner conceded that he knew he was facing a life sentence when, *after* he had

17 confessed, he told his wife he was facing a life sentence, not that he would be out a lot sooner

18 than she might have thought.

19          Petitioner can legitimately question the trial court's tautology logic that because his

20 subordinates knew that they could not make deal promises, their supervisor never would.  Hill, an

21 old salt, might well have thought that his statements to petitioner would never see the light of day

22 regardless of what police bystanders there might have been.  After all, the conversation was not

23 recorded and who is going to turn him in?  However, this legitimate question in no way

24 completely undermines the above evidence, that no deal was ever made, to the point where the

25 trial court's credibility determination was AEDPA unreasonable.

26          Thus, in the final analysis of this first important "promises" factor in the totality of

27 circumstances, after the credibility determination is found in favor of respondent, petitioner is left

28 with only a bare possibility that when his attorney became involved, maybe the DA would make a

plea deal.  This in no way pushes the involuntariness meter any significant distance as the case law does not consider such an illegitimate promise.

### b.   *The Remaining Voluntariness Issues*

The remaining issues do not warrant much discussion.  Petitioner did state during his interrogations that he was under the influence of methamphetamine, or at least had ingested methamphetamine prior to the interrogations.  When asked at the evidentiary hearing, Sgt. Hill (one of the arresting officers) could not tell whether petitioner was under the influence of drugs, RT 75, but Sgt. Hill did state that no evidence of methamphetamine usage was found at the hotel where petitioner was staying.  RT 74, only some marijuana.  However, no part of the evidentiary hearing before the trial court dealt in any medical sense with the degree to which any drug intoxication played a role in the confession.  Nor did the interrogating detectives perform or ask for any test concerning the level of intoxication.

The appellate court found:

> First, the trial court reasonably determined that under the circumstances defendant's mental condition was not a significant issue. The court specifically found that defendant was "lucid" and commented that his speech was not slurred. In fact, defendant was mentally alert and well oriented to his surroundings and the seriousness of the situation, as evidenced by his lengthy discussion with the detectives before his eventual confession. Defendant initially sought to explain that he was innocent, and when it became clear that the detectives did not believe him, he began to hint at the possibility of some type of negotiated agreement. Defendant continued to evaluate and consider the potential dangers of disclosing to police what had occurred even after speaking with Hill. Under the circumstances, there is simply no reason to believe that defendant's confession was the result of the police taking advantage of his mental state or weakened condition. Defendant appears to have acted in the manner that he thought best with a full appreciation for the seriousness of his situation.

> Second, when police arrested defendant on May 4 at a motel, police found some marijuana but no methamphetamine or related paraphernalia.

People v. Luna, 2003 WL 21702376 at *12.

As previously discussed, just being under the influence of drugs is not a circumstance per se that invalidates a confession.  The critical question is—how much.  Was one so intoxicated that he did not really know what was transpiring, or in such a state that he would say anything just to

get the interview over?  Such is not the case here.  Clearly, this circumstance put forth by petitioner does not add much to the totality of circumstances.  The involuntariness meter has hardly risen off zero.

Finally, the undisputed promise by Hill that petitioner would get to see his family if he went back to finish the interrogation, RT 81, 95 does get the aforementioned meter to jump, but not enough by itself, or in the totality of the circumstances, to find that the state court rejection of this circumstance was unreasonable.  The appellate court found:

> It is true that Hill at one point testified that he told defendant that if he spoke again with Detectives Wright and Stevenson and was truthful, Hill would arrange a visit for him with his wife and stepson. And defendant told his wife that he had confessed "so I could see you guys."
>
> But defendant knew that he would have the opportunity for visits with his family on later occasions, and in fact, Detective Stevenson told defendant before his conversation with Hill on May 4 that his wife was planning on visiting him the following day.
>
> Moreover, just before he confessed, defendant told detectives that he needed to talk with his wife and "then I can give you these guys," but Detective Wright answered, "[W]e need you to be willing to talk to us-um-on your own.... Your wife and your son are not here right now. They've already been taken home." Defendant then said, "I know you can't make promises. Just let me see my wife." Yet, defendant then proceeded to relate the identities of his confederates and the circumstances of the crime, despite the absence of any promises from the detectives concerning a visit.
>
> Given the totality of the circumstances, there is no reason to believe that "'defendant's choice to confess was not "essentially free" because his will was overborne' "by the inducement of a day's earlier contact with his family. (*People v. Massie*, supra, 19 Cal.4th at p. 576.) "Such an ephemeral benefit cannot reasonably be regarded as sufficient to cause a person to admit against his will the killing of another human being." (*People v. Morris* (1991) 53 Cal.3d 152, 201, disapproved on another point by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

People v. Luna, 2003 WL 21702376 at *11.[5]

_____

[5]  In a related vein, the appellate court found at *12:
Fourth, to the extent that Sergeant Hill sought to convince defendant to confess by speaking about defendant's family, we likewise find nothing improper in that conduct. The court credited Hill's testimony over defendant's, and Hill's testimony does not indicate that he made any improper threats. At most, Hill indicated that defendant's stepson would appreciate his honesty and that his wife might be arrested if it was later revealed that she had concealed information. But

1     It is certainly true that the specter of not seeing his family due to a life term in prison

2 weighed heavily on petitioner during the interrogation as petitioner raised the subject himself

3 during interrogation and in the garage several times.  While internal pressure on oneself will

4 never make a confession involuntary, it takes some external police conduct to make it so, the

5 internal pressure is a circumstance which if manipulated by police interrogators can be a

6 significant circumstance which may overbear a person's will to not confess.  But as the appellate

7 court made clear, the promise to see one's family a day or so earlier than they would otherwise

8 have been able to do so, was not sufficient incentive to warrant the confession involuntary in the

9 totality of circumstances.  That conclusion is not AEDPA unreasonable.

10 Conclusion to Involuntary Confession

11     The total circumstances surrounding petitioner's confession do not warrant a finding by

12 this court that the confession was not unconstitutionally involuntary.  While that conclusion may

13 have changed *if* a sufficient promise of leniency had been found in combination with the family

14 circumstance promise, the facts were determined otherwise.

15     B.  Second Claim- Inappropriate Photo Line-up

16     Petitioner claims (without providing any photographs for the court to examine) that the

17 police photo-lineup which took place with the victim witnesses in a park close to the robbed

18 residence was unduly suggestive.  Petitioner believes that all of the identifications were suspect,

19 although an inadvertent editorial comment in the petition made by petitioner's then counsel

20 suggests that one witness was meant to be taken out of the argument.  Petitioner's present counsel

21 does not argue this claim in the traverse, nor was it raised on direct review (raised only in a

22 summarily denied state habeas petition).[6]

23 ////

24

---

25 "investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.]

26 The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People*

27 *v. Ray* (1996) 13 Cal.4th 313, 340.)

[6] Respondent argues that the precise claim presented here is unexhausted.  There is no need to

28 reach that issue.

1   Whatever the legal bona fides of this argument under AEDPA, petitioner could never

2   show in this case that the identifications, even if improper, caused a substantial and injurious

3   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 19 (1993).  Petitioner's detailed

4   confession, and the corroborating evidence that petitioner had suffered a bullet wound in the

5   robbery/murder,  as well as his possession of a gun likely used in the robbery/murder overwhelms

6   any mis-identification evidence.  The issue need not be further analyzed.

7   C.  Perjured Testimony

8   In another claim not raised on direct review, and not argued by present counsel, petitioner

9   claims that one of the witnesses committed perjury when she gave an in-court identification of

10  petitioner as one of the robbers.  Despite the fact that the alleged perjury seems to be based on

11  garden variety witness pre-trial statement inconsistencies, with what was testified to at trial, this

12  claim also need not be analyzed on its AEDPA merits as it falls to the same prejudice analysis as

13  made above.[7]

14  D.  Cumulative Error

15  In the last of the state habeas claims, petitioner believes that the cumulative effect of all

16  the errors prejudiced his verdict beyond repair.  Again, there was no error in permitting his

17  confession—a confession in which petitioner detailed his involvement in the crime of conviction.

18  The latter two substantive claims, inappropriate photo line-up, and perjured testimony of one

19  witness, even if meritorious, could not have unduly prejudiced petitioner.

20  *Conclusion*

21  The petition should be denied.  Because the AEDPA standard is so difficult in this case for

22  petitioner to overcome, the undersigned recommends that no Certificate of Appealability (COA)

23  issue.[8]

24  ////

---

25  [7]  Respondent argued that this precise claim was not presented to the California Supreme Court, and is hence, unexhausted.  There is no need to reach that question.

26  [8]  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue

27  or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability may issue only "if the applicant has made a substantial showing of the

28  denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

1    These findings and recommendations are submitted to the United States District Judge

2  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3  after being served with these findings and recommendations, petitioner may file written

4  objections with the court. The document should be captioned "Objections to Magistrate Judge's

5  Findings and Recommendations."  Any response to the objections shall be filed and served within

6  fourteen days after service of the objections. Petitioner is advised that failure to file objections

7  within the specified time may waive the right to appeal the District Court's order.  Martinez v.

8  Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  Dated: October 26, 2016

10                          /s/ Gregory G. Hollows
                     UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28